UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL GRAHAM,

       Plaintiff,

v.                                                                                   Case No. 06-10293

COUNTY OF WASHTENAW, DAVID                          Honorable Sean F. Cox
ARCHER, individually, DIANE HEIDT,
individually, and DAVID EGELER,
individually,

       Defendants.
_____/

## OPINION & ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

       Plaintiff Carl Graham ("Plaintiff"), a long-term employee of the County of Washtenaw

("the County"), filed this action on December 22, 2005, against the County, David Archer

("Archer"), Diane Heidt ("Heidt") and David Egeler ("Egeler"). The matter is currently before

the Court on Defendants' Motion for Summary Judgment. The Court heard oral argument on

April 12, 2007. For the reasons set forth below, the Court shall **GRANT** Defendants' Motion for

Summary Judgment.

## BACKGROUND

       Heidt is the Labor Relations Director for the County. Archer is a Sergeant with the

Washtenaw County Sheriff's Department and Egeler is a Commander with the Washtenaw

County Sheriff's Department.

       Plaintiff began working for the County in 1985. In February, 2005, Plaintiff held the

position of Garage Supervisor Mechanic with the County. (Ex. 7 to Def.'s Br.). Plaintiff was assigned a county-owned vehicle that was to be used for work and for traveling to and from work. (Graham Dep. at 8). Plaintiff's official work hours were from 7:00 a.m. to 3:00 p.m. (*Id.* at 7-8).

Heidt, the County's Director of Labor Relations, testified that on February 10th or 11th, 2005, it was brought to her attention that Plaintiff was drinking alcohol on the job. (Heidt Dep. at 20-21). At that time she was told by Mr. Kipfmiller that Plaintiff had been seen at a bar called Club 23 on a very regular basis at lunch and that he had been involved in a traffic incident with the wife of another county employee near the bar. (*Id.* at 21-23). Kipfmiller expressed concern to Heidt about the safety of Plaintiff and the public. (*Id.*).

At all relevant times, the County's "Drug Free Workplace Policy" provided, in pertinent part, that:

> Washtenaw County shall endeavor to provide a drug-free workplace and environment. In this connection, no County employee shall possess or consume any alcoholic beverage or any illegal drug, including but not limited to marijuana, cocaine, amphetamine, opiate, heroin or phencyclidine (PCP), while on duty or while on County owned or leased property or in a County vehicle. "On Duty" refers to normal working hours or paid overtime.

> While on duty, or on County owned or leased property, or driving a County vehicle, any County employee whose behavior, speech, coordination, balance or reflexes is determined to be affected or impaired by the use of alcohol or illegal drugs shall be in violation of this policy.

> Any County employee who shall be determined to have violated any Federal or State of Michigan law prohibiting alcohol misuse or illegal drug use related to his/her employment with Washtenaw County . . .shall be deemed to be in violation of this County policy.
> . . . .

> Employees found to be in violation of this policy are engaged in serious

misconduct and subject to disciplinary action consistent with the Washtenaw County Personnel Policies and Procedures Article IX, Section 1-7 or the appropriate collective bargaining agreement in addition to legal action which may result.

(Ex. 6 to Defs.' Br.)

Heidt testified that she took the allegations regarding Plaintiff very seriously and contacted Greg Dill ("Dill"). (Heidt Dep. at 24). She advised Dill that an allegation had come forward that she needed to investigate and Dill agreed. Heidt then talked to a private investigator, Jim Ghent ("Ghent") and asked him to do some surveillance to determine if the allegations were true. (*Id*. at 25).

On February 18, 2005, Plaintiff drove a vehicle owned by the County to Club 23 at approximately 2:00 p.m. (Pl.'s Ans. to Req. for Admission, attached as Ex. 2 to Def.'s Br., at ¶ 2 & 3). Ghent entered Club 23 at 3:05 p.m. and observed Plaintiff drinking beer. (Ghent Dep. at 15). By 3:35 p.m., Ghent observed Plaintiff consume two beers and get served a third. (*Id*. at 23). Upon leaving Club 23, Ghent contacted Dave Shirley ("Shirley"), Assistant Director of Facilities for the County about his findings. (*Id*. at 17).

Heidt also learned that Ghent had observed Plaintiff consume several beers at Club 23. (Heidt Dep. at 37-39). Heidt told Shirley that she wanted to take the keys away from Plaintiff. (*Id*. at 40). Because she was close to Club 23, it was decided that Heidt would go to Club 23 to talk to Ghent. (*Id*.). At this point, Plaintiff's vehicle was still in the parking lot. Heidt testified that she and Ghent discussed Heidt approaching Plaintiff to take the keys away, but that Ghent advised her not to do that.

Meanwhile, Egeler contacted Heidt and advised that he was dispatching Archer to Club

23. (Egeler Dep. at 42; Heidt Dep. at 42). Heidt testified that Egeler told her that the only way

the officer would pull Plaintiff over was if that officer determined there was probable cause to do

so. (Heidt Dep. at 42-44). Egeler testified that his instructions to Archer were as follows:

> A. In discussing with Sergeant Archer, I advised him – I gave him a description of what Carl's truck was, because I was familiar with the truck. And that he was to go to the area there as Carl was driving, if he developed Probable Cause to stop Carl to go ahead and do so, at – and take whatever appropriate action as necessary, to treat Carl as any other citizen. If at some point they still were unable to develop Probable Cause to stop him –
>
> Q. Probable Cause regarding what issue?
>
> A. Just any reason –
>
> Q. Okay –
>
> A. – for a traffic violation, whatever. If at some point he was not able to develop Probable Cause to stop Carl, he was to contact me and then the County probably wanted him stopped anyway because he was driving a County vehicle and had been drinking.

(Egeler Trial Testimony at 8-9).

When asked the hypothetical question of what he would have done if Archer had not

found probable cause, Egeler responded as follows:

> A. Hypothetically, what would have happened, is I would have contacted Diane Heidt back and said we don't have Probable Cause to stop the vehicle. We don't have any criminal activity to stop that vehicle. What do you want done? If they had said they wanted to stop the vehicle because they were concerned about a continued driving after they knew that he was drinking and driving (sic), we probably would have stopped the vehicle anyway, without legal authority for any criminal action, and Sergeant Archer would have been acting under directing – a directive from me at that point.

(*Id*. at 8-9).

It is undisputed that Plaintiff left Club 23 at approximately 5:15 p.m. (Pl.'s Ans. to Reqs.

for Admission at ¶ 7). Plaintiff admits that he was operating a county-owned vehicle after

consuming alcohol. (*Id*. at ¶ 8).[1]

Upon leaving Club 23, Plaintiff proceeded to take a right hand turn onto southbound

Carpenter Road. (*Id*. at ¶ 10). Archer testified that Plaintiff failed to signal before making that

left turn:

> Q. Did [Plaintiff] activate [his] turn signal?
> A. Not that I saw, no.
> Q. Were you able to see from your vantage point?
> A. Yes.

(Archer Dep. at 55).

After making the right hand turn and proceeding down Carpenter, Plaintiff made a right

hand turn onto Stoney Creek after which he was pulled over by Archer. (Pl.'s Ans. to Reqs. for

Admission at ¶ 13). Archer testified that prior to pulling the car over, he then observed

Plaintiff's car speeding and that Plaintiff was driving much faster than the posted speed limit.

(Archer Dep. at 26-30). After accelerating his own speed to catch up with Plaintiff, Archer then

activated his emergency lights and stopped Plaintiff's vehicle. (*Id*. at 26-32).

After being pulled over by Archer, Plaintiff admitted to Archer that he was not paying

attention to his speedometer. (Pl.'s Dep. at 55-57). Plaintiff therefore admits that he does not

know the speed at which he was driving. (*Id*.). He testified that Archer asked Plaintiff if he

realized how fast he was going, to which Plaintiff responded that he had "a lot on his mind and

was not paying attention." (*Id*.). Although he admits that he did not know the actual speed at

which he was driving, during his deposition Plaintiff stated that he does not believe that he was

---

[1]Plaintiff also admits that February 18, 2005 was not the first or only date upon which he consumed alcoholic beverages and thereafter operated a county-owned vehicle. (Pl.'s Ans. to Reqs. for Admission at ¶ 27).

driving at an excessive rate of speed, but acknowledges that may have been Archer's legitimate belief. (*Id*.). Plaintiff also testified that he does not specifically recall whether or not he used his turn signal. (*Id.*).

During the stop, Plaintiff informed Archer that he had consumed four and maybe five beers that afternoon. (Pl.'s Ans. to Reqs. for Admission at ¶ 16). Archer testified that after pulling Plaintiff over, he observed that Plaintiff's eyes were glossy and slightly bloodshot, that his speech was slightly slurred, and that he smelled alcohol on Plaintiff's breath. (Archer Dep. at 34-35).

Archer then asked Plaintiff to perform sobriety tests. (*Id*. at 36; Pl.'s Ans. to Reqs. for Admission at ¶ 17). Archer testified that Plaintiff did okay on some of the field sobriety tests. Given Plaintiff's deficient performance on other field sobriety tests,[2] however, Archer believed he had probable cause to arrest Plaintiff. (*Id.* at 38-44). Archer then administered a preliminary breath test after obtaining Plaintiff's consent. (Archer Dep. at 45-46).

Plaintiff was administered a breathalyzer at 6:23 p.m. with test results of .08 and another breathalyzer administered at 6:25 p.m. had test results of .09. (Pl.'s Ans. to Reqs. for Admission at 21 & 22). Plaintiff was then arrested by Archer.

Heidt testified that her goal was to prevent Plaintiff from driving a county vehicle while impaired and that she never intended for Plaintiff to get arrested. (Heidt Dep. at 7-10). After the arrest was made, she talked to the Washtenaw County Executive and then Egeler to see if the

---

[2]Archer had Plaintiff perform the ABC sobriety test, in which the driver is asked to recite the alphabet. Archer testified that Plaintiff missed three consecutive letters, T, U and V. (Archer Dep. at 38-39). He also testified that Plaintiff slightly swayed on the "one-foot-balance" test. (*Id*. at 43).

charges against Plaintiff could be withdrawn but was advised that was not possible. (*Id*.).

On February 22, 2005, Plaintiff was notified that he was being placed on "administrative leave with pay effective immediately pending the result of an internal investigation." (Ex. 5 to Defs.' Br.). Plaintiff was advised that he could be discharged or disciplined. (*Id*.).

Heidt testified that the County's subsequent investigation included reviewing the police report, reviewing Plaintiff's job responsibilities and speaking with Ghent. (Heidt Dep. at 50-53). She states that she conferred with several County managers, including July Kramer ("Kramer"), Greg Dill, Verna McDaniels ("McDaniels"), Bob Guenzel, and Frank Cambria ("Cambria"), as to what action should be taken. Heidt and Kramer discussed issues concerning liability to the County and Kramer expressed that there could be significant liability to the County if it retained Plaintiff in a position that required him to drive and that he should not drive a County-owned vehicle. (Heidt Dep. at 56-57). Kramer, McDaniels and Cambria advised Heidt to terminate Plaintiff's employment. (*Id*. at 60-61). Because Plaintiff was a long-term employee with an otherwise unblemished record, Heidt did not follow that advice and recommended that discipline short of termination should be imposed. (*Id*.).

After meetings with Plaintiff and his union representative, the County and Plaintiff entered into a "Last Chance Agreement" on March 9, 2005. Among other things, the Last Chance Agreement states that:

> 2.      The County and Union agree that Employee Carl Graham was removed from his duties of Garage Supervisor Mechanic on February 21, 2005, as a result of being arrested for driving under the influence of alcohol while in a County vehicle on February 18, 2005. The parties agree that by his actions Mr. Graham has jeopardized the Support Services -Facilities Management Department, as well as the safety of the County's citizens, and that the parties by this agreement are not condoning the actions of Mr.

Graham.

3.  The County and Union also agree that the area of concern must improve in order for the employee to maintain his employment. With the acceptance of the below terms the County and Union have agreed to allow employee Carl Graham back to work on a last chance agreement.

(*Id.*). The Last Chance Agreement provided: 1) a 10-day unpaid suspension for Plaintiff; 2) that Plaintiff would accept a voluntary demotion to the position of Operations Coordinator – Facilities Management; 3) for unannounced alcohol analyses; and 4) that Plaintiff would be terminated if any further incidents occurred. (*Id.*).

Plaintiff ultimately proceeded to trial on the criminal charge of driving under the influence. Plaintiff proceeded to a bench trial on May 9, 2005, and June 21, 2005, in the Trial Court for the County of Washtenaw. (Exs. 9 & 10 to Defs.' Br.). The judge dismissed the charges against Plaintiff because he concluded that Archer did not have probable cause to stop the vehicle.

Plaintiff then requested that the Last Chance Agreement be terminated because the criminal charges had been dismissed. Heidt was asked to reconsider the Last Chance Agreement but ultimately declined to do so. (Heidt Dep. at 66-69). She testified that she discussed the reconsideration request with Kramer, McDaniel and Guenzel and that based on the circumstances of what gave rise to the Last Chance Agreement, the decision was made not to terminate the agreement.

Plaintiff filed this action against Defendants in state court on December 22, 2005, and it was subsequently removed to this Court. Plaintiff's complaint contains the following 4 claims:

- "Violation of the Elliott Larsen Civil Rights Act Against Defendant Washtenaw County" (Count I), wherein Plaintiff alleges that the County violated M.C.L. §37.2205a, "which prohibits an employer from making or maintaining a record of arrest where a conviction did not result," by its creation and maintenance of a "last chance agreement."

- "Violation of Fourth, Fifth, And Fourteenth Amendments Actionable Under 42 U.S.C. 1983 Against The Individual Defendants Egeler And Archer" (Count II), wherein Plaintiff alleges that Egeler and Archer violated his constitutional rights by virtue of an unlawful search, seizure and detention.

- "Violation of Fourth, Fifth, And Fourteenth Amendments Actionable Under 42 U.S.C. 1983 Against The Individual Defendant Heidt" (Count III), wherein Plaintiff alleges that Heidt violated his due process and equal protection rights by causing his arrest, demoting him, improperly subjecting him to the terms of the last chance agreement, and treating him differently than other similarly situated individuals.

- "Malicious Prosecution Against Defendants Egeler, Archer And Heidt" (Count IV), wherein Plaintiff alleges that Egeler, Archer and Heidt improperly caused Plaintiff's unlawful arrest and caused a criminal prosecution that was later terminated in Plaintiff's favor.

## ANALYSIS

A.  Plaintiff's §1983 Claims:

Defendants assert that Plaintiff's §1983 claims must be dismissed because they are each entitled to qualified immunity.

The defense of qualified immunity shield government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Humphrey v. Mabry*, __ F.3d __ at *6 (6th Cir. April 2, 2007).  "Once defendants satisfy their initial burden of demonstrating that they were acting within the scope of their authority, a plaintiff bears the burden of proving that defendants are not entitled to qualified immunity."  *Id.*

In evaluating a qualified immunity defense, the court engages in a two-part analysis.  *Id.;*

*Perez v. Oakland County*, 466 F.3d 416 (6th Cir. Oct. 18, 2006).  The Court first determines whether, taken in the light most favorable to the party asserting the injury, do the facts alleged show the defendant's conduct violated a constitutional right.  *Id*.  "If the Plaintiff does not establish the violation of a constitutional or statutory right, the inquiry ends there and the official is entitled to immunity."  *Id*.

Under the second step, the Court determines whether the right violated was "clearly established" at the time of the violation.  *Id*.  "The burden of showing that the right was clearly established 'rests squarely with the plaintiff.'" The relevant inquiry in determining if a right was clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  The plaintiff must show that the right was clearly established "in light of the specific context of the case, not as a broad general proposition."  *Id.* "If reasonable officers could disagree about the lawfulness of the conduct in question, immunity must be recognized."  *Id*.  In order to determine if the law is clearly established such that a reasonable official could determine that his actions were unlawful, the court looks principally to the law of this circuit and the Supreme Court.  For Plaintiff, this means that he must show that binding authority would have alerted reasonable people in the Defendant's position that their conduct was unlawful.

"The issue of qualified immunity may be submitted to a jury only if the legal question of immunity is completely dependent upon which view of the disputed facts is accepted by the jury. *Humphrey*, __ F.3d at __.

1. <u>Plaintiff's Unlawful Search And Seizure Claim Asserted Against Archer And Egeler (Count II)</u>:

Plaintiff asserts that under Sixth Circuit Authority, if "an officer wishes to make a pretextual traffic stop – a stop not to deal with the violation but to search for or investigate another offense – he or she must have full 'probable cause' to believe that the underlying traffic offense has occurred." (Pl.'s Br. at 10). Plaintiff asserts that Archer lacked such probable cause to believe that either of the underlying traffic offenses (*i.e.*, failure to signal prior to making right hand turn and exceeding the speed limit).

With respect to the right hand turn, Plaintiff asserts that Archer testified "only that he did not see a signal, later admitting that he was not watching for one." (Pl.'s Br. at 12). Plaintiff also points to the fact that Ghent testified he did not notice any traffic offenses, other than Plaintiff's acceleration after making the turn. Based on the above, Plaintiff asserts that a rational jury could find that Archer had no probable cause with respect to the failure to signal.

With respect to speeding, Plaintiff asserts that Archer's testimony that he observed Plaintiff speeding is "demonstrably untrue." Plaintiff, who admits he does not know how fast he was driving and that he was not paying attention, does not submit any admissible evidence to refute that he was exceeding the speed limit. Rather, Plaintiff asserts that portions of Archer's deposition testimony are inconsistent with his trial testimony.

Plaintiff further asserts that Archer's subsequent arrest of Plaintiff was without probable cause. Plaintiff notes that he performed some field sobriety tests correctly and criticizes Archer's use of other tests.

As to Egeler's liability, Plaintiff asserts that although there is no derivative liability under

§1983, one who encourages or participates in a specific violation can be held liable.  Plaintiff claims that Egeler was a direct participant in the alleged violation because "it was Defendant Egeler who made the decision to stop Plaintiff whether or not there was the required probable cause, and who instructed Defendant Archer to do so."  (Pl.'s Br. at 15).

Defendants assert that Archer did not violate Plaintiff's Fourth Amendment Rights because he had probable cause to stop and arrest Plaintiff.  Defendants assert that the Supreme Court has made it clear that the "[c]onstitutional reasonableness of [a] traffic stop does not depend on the actual motivations of the individuals officers involved" citing *U.S. v. Whren*, 517 U.S. 806, 813 (1996).  Similarly, they note that the Sixth Circuit has explained that "if the facts known to the officer at the time of the stop were sufficient to constitute probable cause to believe that a traffic violation had occurred, a reviewing court may not look at the officer's . . . conduct or conversations that occurred before or after the stop to invalidate the stop as pretextual." *U.S. v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).  Defendants also rely on *U.S. v. Perez*, 440 F.3d 363, 367-70 (6th Cir. 2006)(finding probable cause despite fact that officer had been instructed to pull the defendant over even if he failed to find a traffic violation).

Defendants further assert that Egeler did not violate Plaintiff's constitutional rights by directing Archer to look for a reason to pull Plaintiff over, stating:

> Egeler testified, without contradiction, that he advised Archer to look for probable cause to pull Plaintiff over, but if Archer did not find probable cause, to call him back to discuss whether the County wanted Plaintiff pulled over anyway . . . Archer never called Egeler back, and thus, Egeler never instructed Archer to stop Plaintiff without probable cause.  There is no question that police officers may stop a vehicle if there is probable cause that a traffic violation occurred, even if the reason for the stop is pretextual. . . Thus, giving that direction to Archer did not violate any of Plaintiff's constitutional rights.

(Defs.' Reply at 4).

As explained below, the Court agrees that, under the undisputed facts presented, Archer had probable cause to stop Plaintiff's vehicle and ultimately arrest Plaintiff.

The Sixth Circuit has held that as long as an officer "has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *U.S. v. Ferguson*, 8 F.3d at 391. The proper focus is "on whether this particular officer in fact had probable cause to believe that a traffic violation had occurred. The stop is reasonable if there was probable cause, and it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." *Id.*

A probable cause determination is "fact-dependant and will turn on what the officer knew at the time he made the stop." *Id.* "[I]f the facts known to the officer at the time of the stop were sufficient to constitute probable cause to believe that a traffic violation occurred, a reviewing court may not look at the officer's ordinary routine, or his conduct or conversation that occurred before or after the stop to invalidate the stop as pretextual." *Id.*

Thus, the Court must first determine if Archer had probable cause to believe that Plaintiff had committed a traffic violation. The undisputed facts show that he had such probable cause.

First, Archer testified that Plaintiff made a right hand turn without using his turn signal. Plaintiff testified during his deposition that he does not recall if he used his signal that day or not and does not know whether Archer is telling the truth or not when Archer says that Plaintiff failed to use his turn signal. (Plaintiff's Dep. at 54-55). Plaintiff's reliance on Ghent's testimony is misplaced because Ghent only testified that he did not notice any traffic offenses other than accelerating after a turn. Ghent did not testify affirmatively that he saw Plaintiff use his turn

signal. Thus, there is no record evidence to contradict Archer's sworn testimony that Plaintiff failed to use his signal.

Second, Archer, who is an experienced officer and is radar-certified, testified that although he did not have the benefit of radar, he observed Plaintiff exceeding the speed limit. Archer testified that he could determine that Plaintiff's vehicle was speeding based on his own personal experience. Plaintiff has offered no record evidence to contradict Archer's testimony. To the contrary, Plaintiff acknowledges that he had consumed 4 or 5 beers, was not paying attention and did not know how fast he was driving.

The Court therefore finds that Archer had probable cause to believe that Plaintiff had committed a traffic violation.

The Court also finds that the undisputed evidence establishes that Archer had probable cause to arrest Plaintiff after pulling his vehicle over. The undisputed evidence indicates that: 1) Plaintiff admitted that he was driving after consuming 4 or 5 beers, 2) Plaintiff admitted he was not paying attention to how fast he was driving, 3) Plaintiff had deficient performance with respect to two field sobriety tests; 4) Archer observed that Plaintiff had alcohol on his breath and had glossy and somewhat bloodshot eyes; and 5) after consenting to a breathalyzer, Plaintiff had test results over the legal limit. Thus, Archer had probable cause to arrest Plaintiff.

The Court further concludes that any assertion of liability based on Egeler's direction to Archer also fails. As Defendants note, Egeler testified that he told Archer to pull the car over if he found probable cause, as he would with any other citizen. Egeler did tell Archer to call him back **if** he did not find such probable cause because the County **might** want him pulled over any way, but Egeler notably also testified that hypothetical never happened. Thus, to the extent that a

14

constitutional violation would have occurred if Egeler had called Archer back and instructed him to stop Plaintiff without probable cause, such a violation never actually occurred.

Accordingly, under the undisputed facts, no constitutional violation occurred and Defendants Archer and Egeler are therefore entitled to qualified immunity as to Count II.

2.    Plaintiff's Due Process And Equal Protection Claims Asserted Against Heidt (Count III):

_____In Count III, Plaintiff asserts both a due process claim and an equal protection claim against Heidt.

a.    Due Process Claim:

"Procedural due process generally provides that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest." *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005).

With respect to the due process claim, Defendants state that due process is satisfied under established case law when the employer provides oral or written notice of its proposed action and a pre-termination hearing that gives the employee an opportunity to be heard. *Cleveland v. Loudermill*, 470 U.S. 532 (1985). Defendants contend that the undisputed evidence shows that Plaintiff received written notice on February 22, 2005, when he was informed that if it was determined that he was driving a county-owned vehicle while impaired he would be discharged or disciplined. They also contend that it is undisputed that Plaintiff had an opportunity to be heard before any disciplinary action was taken because Heidt and others meet with Plaintiff, Plaintiff's union representative participated in the meetings, and Plaintiff voluntarily agreed to the Last Chance Agreement.

Plaintiff did not respond to Defendants' challenges to Plaintiff's due process claim and the Court concludes that summary judgment is warranted on this claim because the undisputed evidence establishes that Plaintiff was given a pre-termination hearing and an opportunity to be heard.

  b.  <u>Equal Protection Claim</u>

"No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. The purpose of the equal protection clause is to secure every person within a state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through its duly constituted agents. *Warren v. City of Athens*, 411 F.3d at 710.

"Equal protection claims can be brought by a 'class of one,' where the plaintiff alleges that the state treated the plaintiff differently from others similarly situated and that there is no rational basis for such difference in treatment." *Id.* (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

"The 'rational basis' test means that courts will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude the [government's] actions were irrational." *Id.* "A 'class of one' plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by 'negativ[ing] every conceivable basis which might support' the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* at 711.

With respect to the equal protection claim, Defendants assert that disparate treatment is a

threshold element of any equal protection claim but that here, Plaintiff cannot identify any similarly-situated employee who operated a county-owned vehicle while legally impaired by alcohol but was not disciplined. It also asserts that Defendant cannot negative every conceivable basis for the challenged action or establish that the action was motivated by animus or ill-will.

Plaintiff contends that at pages 31 and 48-49 of Egeler's deposition transcript "Egeler admitted that Plaintiff was singled out for unprecedented treatment." Plaintiff contends that Egeler treated Plaintiff differently from others similarly situated in that he testified that "the Sheriff's department does not make traffic stops if someone calls and reports that someone is drinking at such and such bar." (Pl.'s Resp. at 16). Plaintiff then asserts that he can demonstrate a lack of rational basis for that alleged disparate treatment in that Egeler was motivated by ill-will against Plaintiff. Plaintiff appears to concede that he has no evidence to establish that Heidt had any ill-will towards him but asserts that there is no rational basis for her actions.

The Court agrees that Defendants are entitled to summary judgment on Plaintiff's equal protection claim. To proceed on a class of one equal protection claim, Plaintiff must establish that: 1) the state treated Plaintiff from others similarly situated; and 2) there is no rational basis for such difference in treatment by either: a) negativing every conceivable basis that might support the challenged action; or b) by establishing that the challenged government action was motivated by animus or ill-will.

Plaintiff cannot meet the first element because he cannot establish that Egeler or Heidt treated Plaintiff differently from any other County employee under the same or similar circumstances. In order to do so, Plaintiff would have to establish that: 1) Heidt received reports that other County employees who drive county-owned vehicles were drinking on the job, but

17

failed to investigate or act on the allegations; or 2) that Egeler had participated in such actions and had failed to send an officer to a scene where the County employee had been observed drinking alcohol and then driving a county-owned vehicle. Plaintiff, however, cannot do so.

Egeler testified that he has never been involved in investigating an employee who was accused of violating the County's alcohol policy. In addition, contrary to Plaintiff's characterization of Egeler's testimony, he also testified that if the Sheriff's department gets a general tip[3] that a person has been drinking in a bar and getting ready to leave and drive a car, that information is usually put out to officers in the area to be "on the lookout"and that the department "may even dispatch a car to the area if there's one available to try to observe if there's any illegal behavior." (Egeler Dep. at 31, 48-49). Thus, Plaintiff cannot even establish that Plaintiff was treated differently than the general public, let alone treated differently than County employees driving county-owned vehicles.

Similarly, Plaintiff has not identified any similarly situated County employees who were treated differently by Heidt. Thus, Plaintiff cannot meet the first essential element of his class of one equal protection claim.

Plaintiff also cannot negative every conceivable basis for Heidt or Egeler's actions. Heidt has a legitimate basis for investigating County employees who have been reported to be drinking on the job and driving a county-owned vehicle after drinking – to limit the County's liability, to enforce County policies, and to protect the public. She also had a legitimate basis for demoting Plaintiff - he operated a county-owned vehicle when he was over the legal limit. As Defendants note, Plaintiff himself admits that his conduct was "stupid," that it turns out he was over the legal

_____

[3](*i.e.*, a tip that does not involve a County employee driving a County-owned vehicle).

limit while driving a county-owned vehicle, and that his conduct warranted discipline.

(Plaintiff's Dep. at 49-50, 82, 88).  For example, Plaintiff testified as follows:

> Q.   Okay.  Did you tell him you did something stupid?
> A.   Yes.
> Q.   All right.  What was stupid about it?
> A.   I stopped and got pulled over–
> Q.   And that's –
> A.   And ended up getting arrested.
> Q.   Okay.  What was stupid?
> A.   Stopping and having a few beers and getting arrested.
> Q.   Okay.  Why is that stupid?
> A.   Because it got me in a heck of a lot of trouble.
> Q.   Why?
> A.   Because as it turns out, I was over the limit for alcohol at that time.

(Plaintiff's Dep. at 49).

Egeler also has a legitimate basis for sending a car to observe a County employee who is reported to be driving a county-owned vehicle after consuming alcohol – to assist the County in enforcing its policies and reducing liability, as well as preventing an impaired driver from injuring himself or others.  Indeed, Plaintiff himself acknowledged during his deposition that the County would have a legitimate concern if they are informed that employee is consuming alcohol and thereafter driving a county-owned vehicle.  (Plaintiff's Dep. at 82).

In addition, Plaintiff has not established that Heidt was motivated by ill-will or animus. To the contrary, Plaintiff testified that to his knowledge she has no vendetta against him. (Plaintiff's Dep. at 111).  Given Plaintiff's deposition testimony that there is nothing specific that would lead him to believe that Egeler had a vendetta against him (Plaintiff's Dep. at 111-112), the Court concludes that Plaintiff can not now establish ill-will by presenting an affidavit that claims otherwise.  Moreover, Plaintiff's complaint only asserted the equal protection claim

against Heidt, it does not assert that claim against Egeler or Archer.

Accordingly, for all of these reasons, the Court shall grant summary judgment in favor of Defendants on Count III.

B.    Plaintiff's Malicious Prosecution Claim Against Egeler, Archer & Heidt (Count IV):

Plaintiff acknowledges that under Michigan law, a plaintiff seeking to sue on the grounds of malicious prosecution must prove the following four essential elements: 1) that the defendant has initiated a criminal prosecution against him; 2) that the criminal proceedings terminated in his favor; 3) that the person who instituted or maintained the prosecution lacked probable cause for his actions; and 4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice. (Pl.'s Resp. at 19).

Defendants do not dispute that the criminal proceeding terminated in Plaintiff's favor, but assert that Plaintiff's claim fails because he cannot establish the remaining essential elements. Defendants assert that the people of York Township, not Defendants, initiated the criminal prosecution against Plaintiff. They also assert that probable cause existed for their actions, as discussed in the section dealing with the §1983 claims. Finally, they assert that Plaintiff cannot establish that Defendants acted with malice as opposed to a purpose to bring an offender to justice.

For the reasons set forth above, Plaintiff cannot establish the essential element of a lack of probable cause for Defendants' actions. His malicious prosecution claim therefore fails.

C.    Plaintiff's Elliott-Larsen Claim Against The County (Count I):

The County asserts that Plaintiff's claim that the County violated M.C.L. §37.2205a must be dismissed because the County is a political subdivision of the state which is exempt from the

general prohibition against maintaining a record of arrest that did not result in a conviction and relies on M.C.L. §37.2205a(1); *Bischoff v. Calhoun County Prosecutor*, 173 Mich. App. 802, 811 n.3 (1989).

The Court agrees. The provision of the ELCRA at issue provides that an employer, "**other than a** law enforcement agency of this state or **a political subdivision of this state**," shall not maintain certain records regarding a misdemeanor arrest where a conviction did not result. M.C.L. §37.2205a(1)(emphasis added). The ELCRA further provides that "'Political subdivision' means a county, city village, township, school district, or special district or authority of the state." M.C.L. §37.2103(h). Accordingly, this claim must be dismissed because the statutory provision at issue expressly exempts the County.[4]

## CONCLUSION & ORDER

For the reasons above, **IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED**.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: May 8, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 8, 2007, by electronic and/or ordinary mail.

s/Jennifer Hernandez
Case Manager

---

[4]Moreover, at the April 12, 2007 hearing, Plaintiff's counsel acknowledged that Defendant is entitled to summary judgment with respect to this claim.